UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

This document relates to: 04 Civ. 9771

MASTER DOCKET
04 MD 1653(LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DR. ENRICO BONDI,

                Plaintiff,

04 Civ. 9771 (LAK)

-against-

GRANT THORNTON INTERNATIONAL, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> John B. Quinn
> Loren Kieve
> Michael B. Carlinsky
> R. Brian Timmons
> Terry L. Wit
> QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
> *Attorneys for Plaintiff*
>
> Michael J. Dell
> Timothy P. Harkness
> Jonathan A. Popolow
> KRAMER LEVIN NAFTALIS & FRANKEL, LLP
> *Attorneys for Defendant Deloitte Touche Tohmatsu*

LEWIS A. KAPLAN, *District Judge.*

        This is one of a number of actions before the Court arising out of the collapse of the international dairy conglomerate that included Parmalat Finanziaria, S.p.A., Parmalat S.p.A. and

their subsidiaries (collectively "Parmalat"). Dr. Enrico Bondi ("Bondi"), the Extraordinary Commissioner of Parmalat here sues its auditors and their affiliates for fraud and professional malpractice and on related claims. Plaintiff has moved to compel discovery by certain defendants, including Deloitte Touche Tohmatsu ("DTT"). Although most of the issues raised by this motion and those of the other defendants are being disposed of by summary order, the Court writes briefly to address DTT's contention that it should not be compelled to produce documents located in Switzerland that were provided to it by member firms of the Deloitte organization, allegedly for the purpose of obtaining legal advice in connection with an investigation into the Parmalat scandal by the United States Attorney for this district.[1]

*Facts*

This issue arises in consequence of the structure of the Deloitte organization, which is not unusual among the major international accounting firms. That structure is detailed in the Court's opinion ruling on the motions to dismiss the securities complaint by DTT and the other auditor defendants,[2] familiarity with which is assumed. It is necessary to summarize briefly only a few basic points.

Accounting and auditing standards and the regulation of the practice of accounting vary to some extent from country to country. Deloitte and other such organizations consist of individual firms organized under the laws of each of the countries in which business is done as well

---

[1] Lambert Decl. ¶¶ 12-13.

[2] *In re Parmalat Sec. Litig.,* No. 04 MD 1653 (LAK), 2005 WL _____ (S.D.N.Y. June 28, 2005).

as an umbrella entity with which the individual, country-specific firms are affiliated. In Deloitte's case, DTT is the umbrella organization, and it is organized as a verein under Swiss law, a form of business organization that DTT asserts is analogous to an incorporated membership association.[3] According to DTT, it "does not control its member firms" and performs no accounting or auditing services.[4] DTT acknowledges that most of the jurisdictions in which its member firms practice have accounting rules that prohibit an accountant from sharing client documents, even with the client's permission, and it claims that "DTT is required by its own organizational documents to respect the independence of its member firms."[5]

When it became apparent that there would be litigation relating to Parmalat, DTT engaged a U.S. law firm to "provide legal advice to DTT and on behalf of certain member firms that conducted the Parmalat Audits" and which it coordinated.[6] Some member firms provided DTT in Switzerland with documents concerning the Parmalat audits for review by that law firm. Others allowed the law firm to go to their offices in their respective home countries to review documents.[7] To whatever extent DTT possesses or controls documents relating to the Parmalat audits, it asserts, it does so only by virtue of the foregoing. These documents would be have been unobtainable by subpoena prior to their transfer to DTT, it contends, and they therefore should be unobtainable now

---

[3] Lambert Decl. ¶ 2.

[4] *Id.* ¶¶ 6-7.

[5] *Id.* ¶¶ 8-9.

[6] *Id.* ¶¶ 11-12.

[7] *Id.* ¶¶ 13-14.

by virtue of the attorney-client privilege.

*Discussion*

Consideration of whether the plaintiff may obtain these documents begins with *Fisher v. United States*.[8] The Supreme Court there considered the question whether documents that a taxpayer turned over to his lawyer, production of which could not be compelled from the taxpayer in light of the Fifth Amendment's privilege against self incrimination, could be obtained from the attorney over the taxpayer's objection. The Court first concluded that compelled production from the attorney would not implicate the Fifth Amendment.[9] It then explained, albeit only in *dicta,* that the documents might not be obtainable because they were protected by the attorney-client privilege.[10] It reasoned that "each taxpayer transferred possession of the documents in question from himself to his attorney in order to obtain legal assistance" and therefore "the papers, if unobtainable by summons from the client, are unobtainable by summons directed to the attorney by reason of attorney-client privilege."[11]

The Second Circuit applied this reasoning in *In re Application of Sarrio, S.A.*[12] Sarrio, a Spanish company, was involved in a dispute in Spain with the Kuwaiti Investment

---

[8] 425 U.S. 391 (1976).

[9] *Id.* at 400.

[10] *Id.* at 402-04.

[11] *Id.* at 405.

[12] 119 F.3d 143 (2d Cir. 1997).

Authority ("KIA") and its subsidiary. In furtherance of its claim, Sarrio notified counsel for Chase Manhattan Bank, N.A. ("Chase") that it would seek production of documents from Chase branches in Spain and London that had made loans to KIA's subsidiary. Chase's lawyers in New York consequently directed its branch offices to send those documents to them for review.[13] Ultimately, Sarrio's subpoena sought only those documents present in the United States. The district court quashed the subpoena, holding that the documents would not have been obtainable by subpoena while outside the United States and that they were protected by the attorney-client privilege because Chase had brought them to New York only for the purposes of legal review.

On appeal, the Second Circuit concluded that *Fisher* provided "principled authority, although in dicta, for recognizing attorney-client privilege."[14] It cautioned, however, that *Fisher* supported Chase's position only insofar as the documents would have been unobtainable by subpoena prior to the transfer to Chase in New York. In other words, "'preexisting documents which could have been obtained by court process . . . may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice.'"[15] Ultimately, the court did not decide the issue, concluding that the appeal was moot because Chase did not assert attorney-client privilege on appeal and KIA had no standing to assert it.

This brings us to the circuit's recent decision in *Ratliff v. Davis Polk & Wardwell*.[16]

---

13

*Id*. at 145.

14

*Id*. at 146.

15

*Id*. at 147 (quoting *Fisher*, 425 U.S. at 403-04) (citing *Grant v. United States*, 227 U.S. 74, 79-80 (1913)).

16

354 F.3d 165 (2d Cir. 2003).


The plaintiff there sought documents that the Dutch firm Ernst & Young Accountants had sent to the Davis Polk law firm for transmission to the Securities and Exchange Commission ("SEC"). Plaintiff served a subpoena on Davis Polk, which objected on the ground that its client was not subject to the jurisdiction of the United States courts. The district court denied the motion to compel, relying on *Sarrio* and holding that "documentary evidence is not available from a lawyer custodian, even absent attorney-client privilege, if the court does not have jurisdiction over the client/owner."[17]

The Second Circuit rejected this analysis, explaining that the animating principle of *Sarrio* was privilege. It reasoned that "[e]xposing documents – not otherwise subject to production – to discovery demands after delivery to one's attorney whose office was located within the sweep of a subpoena would produce a curious and unacceptable result"[18] only because the "price of an attorney's advice would be disclosure of previously protected matters."[19] The court held that this principle did not apply to the case before it because Davis Polk had turned the documents over to the SEC and thus did not claim that they were privileged. Without the privilege, the court concluded, no significance attached to the fact that the documents were held by lawyers. "Indeed, documents held by an attorney in the United States on behalf of a foreign client, absent privilege, are as susceptible to subpoena as those stored in a warehouse within the district court's jurisdiction."[20]

---

[17] *Id.* at 167.

[18] *Id.* at 169.

[19] *Id.*

[20] *Id.*

As these cases make clear, the threshold question is whether these documents would have been obtainable by subpoena in the hands of the DTT member firms. And there simply is no way to tell on this record.

First, there is no privilege log,[21] and DTT has disclosed neither the identities of the producing firms, the documents as to which DTT asserts privilege, nor the identities of the firms that also retained DTT's U.S. law firm. These are not irrelevant details. The argument for finding that documents furnished by a member firm that also engaged DTT's U.S. law firm are unreachable because the documents were furnished for obtaining legal advice is substantial. On the other hand, documents furnished by a member firm that did not also retain the U.S. law firm presumably were furnished for the convenience of DTT and in any case not for the purpose of the member firm obtaining the advice of the U.S. law firm. While DTT, by saying that the legal advice to member firms was "coordinated by DTT,"[22] implies that the former is the situation in each case in which documents were sent to it, that is not the inevitably correct reading of its papers.

Second, and independent of the prior point, the vagueness and opacity of Deloitte's presentation prevents anything other than an ill-informed guess as to whether the documents sent to Switzerland by member firms could have been obtained by compulsory process directly from the member firms. It may well be that some or, indeed, all of the producing firms are subject to U.S. compulsory process and perhaps even more likely that the materials could be obtained pursuant to

---

[21] S.D.N.Y. CIV. R. 26.2 requires that any party objecting to disclosure on grounds of privilege produce a schedule, commonly known as a privilege log, setting forth information pertinent to determination of whether the information in fact is protected by privilege. DTT's failure to comply with the Rule alone is sufficient basis to overrule its objection.

[22] Lambert Decl. ¶ 11.

the Hague Convention on Taking Evidence in Civil or Commercial Matters.[23]

For these, and possibly other, reasons, it cannot be said at this point that these documents are unobtainable by subpoena or other compulsory process. It therefore cannot be said that the documents fall within the framework of *Fisher* and *Sarrio*.

One seeking to withhold documents on the basis of privilege has the burden to demonstrate that the privilege applies.[24] DTT has not carried that burden here.

*Conclusion*

For the foregoing reasons, DTT's objections to discovery seeking documents and information derived from the documents that it assembled in Switzerland in connection with the investigations of the Parmalat scandal are overruled.

SO ORDERED.

Dated: June 28, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[23] 23 U.S.T. 2555, *reprinted in* 28 U.S.C. § 1781 Note.

[24] *See, e.g., von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).