UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

MASTER DOCKET
04 MD 1653 (LAK)

This document relates to: 04 Civ. 9771

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DR. ENRICO BONDI,

        Plaintiff,

     -against-                  04 Civ. 9771 (LAK)

GRANT THORNTON INTERNATIONAL, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

John B. Quinn
Loren Kieve
Michael B. Carlinsky
R. Brian Timmons
Terry L. Wit
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
*Attorneys for Plaintiff*

Brian M. Cogan
James L. Bernard
Quinlan D. Murphy
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant
Thornton International*

Bruce R. Braun
Linda T. Coberly
Theodore Z. Polley III
WINSTON & STRAWN LLP
*Attorneys for Defendant Grant
Thornton LLP*

Michael J. Dell
Timothy P. Harkness
Jonathan A. Popolow
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
*Attorneys for Defendant Deloitte Touche
Tohmatsu*

Alan N. Salpeter
Stephen M. Shapiro
Michele Odorizzi
Daniel L. Ring
Robert J. Ward
MAYER, BROWN, ROWE & MAWE LLP
*Attorneys for Defendants Deloitte & Touche
USA LLP and Deloitte & Touche LLP*

Richard A. Martin
Kevin J. Toner
Mark Picard
Patryk J. Chudy
HELLER EHRMAN WHITE & MCAULIFFE LLP

*Attorneys for Defendant Deloitte & Touche*
*S.p.A.*

LEWIS A. KAPLAN, *District Judge.*

After Parmalat collapsed in scandal in December 2003,[1] Dr. Enrico Bondi, the

Extraordinary Commissioner of Parmalat Finanziaria, S.p.A., Parmalat S.p.A., and its affiliates in

Extraordinary Administration in Italy (collectively "Parmalat"), brought this action against

Parmalat's former auditors and their affiliates on the grounds of professional malpractice, fraud,

aiding and abetting fraud and constructive fraud, negligent misrepresentation, aiding and abetting

breach of fiduciary duty, theft and diversion of corporate assets, conversion, aiding and abetting

fraudulent transfer, deepening insolvency, and unlawful civil conspiracy.[2]  The Court previously

ruled on motions to dismiss the complaint and it assumes familiarity with the prior opinion.[3]

Defendants move to dismiss the First Amended Complaint ("FAC") pursuant to Federal Rule of

Civil Procedure 12(b)(6).

## I.      The Original Complaint

The original complaint alleged various malpractice and fraud claims against

Parmalat's former auditors, Grant Thornton S.p.A. ("GT-Italy"), now known as Italaudit, S.p.A., and

---

[1]

First Amended Complaint ("FAC") ¶¶ 1, 42.

[2]

Plaintiff commenced this case in Illinois state court.  Defendants removed it to federal
court. The Judicial Panel on Multidistrict Litigation transferred it here.  *In re Parmalat
Securities Litig.*, 350 F. Supp.2d 1356 (J.P.M.L. 2004).

[3]

*See Bondi v. Grant Thornton Int'l*, 377 F. Supp. 2d 390 (S.D.N.Y. 2005) ("*Grant Thornton
II*").

Deloitte & Touche S.p.A. ("Deloitte Italy") and their respective affiliates Grant Thornton International ("GTI") and Grant Thornton LLP ("GT-USA"), and Deloitte Touche Tohmatsu ("DTT") and Deloitte & Touche USA LLP and Deloitte & Touche LLP (collectively "Deloitte USA"). The same transactions and conduct described in the original complaint now are detailed in the FAC and summarized below. In broad brush, the original complaint described how the Italian accounting firms, GT-Italy and Deloitte Italy, committed fraud and malpractice in their audits of Parmalat. The complaint further described how the individual Grant Thornton and Deloitte member firms are organized under international umbrella organizations and sought to hold those organizations (GTI and DTT), as well as the United States member firms (GT-USA and Deloitte USA), liable for the Italian firms' misconduct.

In seeking to hold the umbrella and United States entities liable for the actions of their Italian affiliates, plaintiff claimed that DTT and Deloitte USA had an agency, joint venture, and *alter ego* relationship with Deloitte Italy, and that GTI and GT-USA had an agency, joint venture, and *alter ego* relationship with GT-Italy.

The Court previously considered whether the original complaint adequately alleged facts supporting those theories.[4] It held that an agency relationship between DTT and Deloitte Italy could be inferred from the allegations regarding shared professional standards, an associational name, peer reviews, and DTT's control over member firms such that DTT could intervene in the conduct of a particular audit.[5] Similarly, the allegations describing GTI's control over the manner

---

[4]

      *See id.* at 401.

[5]

      *See id.* at 405.

in which GT-Italy conducted the Parmalat audit and its ability to expel GT-Italy were sufficient to allege an agency relationship between GTI and GT-Italy.[6]

In contrast, the original complaint alleged no basis for holding Deloitte USA liable for Deloitte Italy's conduct. Allegations that Deloitte USA was a co-agent of Deloitte Italy were insufficient to establish agency, as an agent generally is not liable for the acts of co-agents.[7] Nor did the original complaint allege adequately the existence of a joint venture, as it did not show that its purported members had the right to "direct and govern the conduct" of other members of the supposed joint venture to audit Parmalat.[8] Finally, plaintiff's allegations that Deloitte USA was an *alter ego* of Deloitte Italy fell short, as the original complaint at most alleged some overlap of personnel.[9] Accordingly, the vicarious liability claims against Deloitte USA were dismissed.[10]

---

[6]
   *See id.* at 408.

[7]
   *See id.* at 406.

[8]
   *Id.* at 407.

[9]
   *See id.* at 407-08.

[10]
   The original complaint purported also to bring direct claims against Deloitte USA but failed to allege the manner in which it acted wrongfully or with knowledge of fraud. With no allegations of Deloitte USA's misconduct or *scienter*, the direct claims against it were dismissed. *See id.* at 411 (no explanation of how Deloitte USA breached its duty of care or how its actions led to Parmalat's losses), 412 (no basis to infer that Deloitte USA knowingly participated in a fraudulent act), 414 (same), 416 (same), 417 (same).

The original complaint contained no specific allegations against GT-USA whatsoever and provided no basis for an inference that it controlled any wrongdoer.[11] All claims against it accordingly were dismissed.

The Court further dismissed Counts Six (theft and diversion of corporate assets) and Nine (aiding and abetting fraudulent transfer) as not recognized by Illinois law and Count Ten (deepening insolvency) as redundant of the malpractice claim.[12] Finally, the complaint was dismissed to the extent that Bondi sought recovery for injuries not belonging to the bankruptcy estate.[13]

## II.     *The First Amended Complaint*

The FAC alleges the following facts, which the Court assumes to be true for purposes of these motions.

## A.     *The Parties*

### 1.     *Plaintiff*

Plaintiff Dr. Bondi has been appointed by the Italian government as the Extraordinary Commissioner of Parmalat, a position he contends is similar to that of a bankruptcy trustee in the

---

[11] *See id.* at 408-09.

[12] *See id.* at 415, 417, 419.

[13] *See id.* at 421.

United States.[14]  He brings this action on behalf of Parmalat against its former auditors, GT-Italy, now known as Italaudit, S.p.A., and Deloitte Italy, and their respective affiliates, GTI and GT-USA and DTT and Deloitte USA.

2.     *Defendants*

a.     *Deloitte Defendants*

DTT is a Swiss verein,[15] headquartered in New York and the umbrella firm for the international accounting enterprise commonly known as "Deloitte."[16]  Deloitte USA consists of Deloitte & Touche LLP and Deloitte & Touche USA LLP, both of which are Delaware limited liability partnerships and together comprise the United States member firm of the Deloitte organization.[17]  Deloitte Italy is a società per azioni, an Italian limited liability entity, and the Italian member firm of DTT.[18]  Plaintiff alleges that Deloitte Italy partners Adolfo Mamoli and Giuseppe

---

[14]

FAC, ¶¶ 43-45.

[15]

"Verein" means association, society, club, or union.  CASSEL'S GERMAN DICTIONARY 662 (1978); *see also* LANGENSCHEIDT'S STANDARD DICTIONARY OF THE ENGLISH AND GERMAN LANGUAGES 1163 (6th ed. 1970).

[16]

FAC ¶¶ 52, 179.

[17]

*Id.* ¶¶ 53-54.

[18]

*Id.* ¶¶ 56, 200.

Rovelli, who served as lead partners on the Parmalat audit, "were DTT's contact persons in Italy"[19] and that they held positions with specialized groups within DTT.[20]

According to plaintiff, DTT and the Deloitte firms hold themselves out as an integrated worldwide accounting organization with DTT at the helm of "a global strategy executed locally in nearly 150 countries."[21] The Deloitte firms report revenue on a combined basis[22] and have a centralized decision-making process.[23] DTT creates professional standards to which member firms must adhere and oversees their activities to ensure that "clients receive 'uniform, quality service wherever they do business, anywhere in the world.'"[24]

Plaintiff asserts that Deloitte operated as a unified, multinational accounting firm in respect of the Parmalat audit with 36 member firms or offices joining together to audit Parmalat and its subsidiaries.[25] DTT, Deloitte Italy, and the member firms shared in the compensation received for the Parmalat audit and each contributed funds and/or resources to that project.[26]

---

[19]
     *Id.* ¶ 200.

[20]
     *Id.* ¶¶ 215-16.

[21]
     *Id.* ¶ 182 (quoting a Deloitte web page).

[22]
     *Id.* ¶ 186.

[23]
     *Id.* ¶ 187.

[24]
     *Id.* ¶ 190.

[25]
     *Id.* ¶ 201.

[26]
     *Id.* ¶¶ 326-27, 330.

*b.*     *Grant Thornton Defendants*

GTI is an Illinois nonprofit corporation headquartered in London that serves as the umbrella organization for the Grant Thornton firms providing accounting services to mid-size companies.[27] GT-USA is an Illinois limited liability partnership and the United States member firm of GTI.[28] Prior to January 2004, GT-Italy, a società per azione, was the Italian member firm of Grant Thornton.[29]

Plaintiff alleges that GTI and its member firms hold themselves out as a unified accounting organization with offices in over 100 countries.[30] Member firms are required to adhere to certain standards and to comply with Grant Thornton procedures.[31] GTI performs a regular review of its member firms and requires that they use the Grant Thornton logo and name when bidding for and providing services.[32] Members firms cooperate on certain engagements and individual partners of these firms attend meetings together and participate in global practice groups.[33]

---

[27]
    *Id.* ¶¶ 47, 91.

[28]
    *Id.* ¶ 48.

[29]
    *Id.* ¶ 49.

[30]
    *Id.* ¶¶ 91-95.

[31]
    *Id.* ¶ 97.

[32]
    *Id.* ¶¶ 101, 106.

[33]
    *Id.* ¶¶ 103-04, 110.

B.      *Grant Thornton and the Origins of the Parmalat Insiders' Fraud*

According to the FAC, beginning in the mid-1990s, several corrupt Parmalat insiders orchestrated a series of massive frauds on Parmalat in order to "siphon off billions of dollars and euros from the company into their own pockets."[34]  These insiders included Parmalat's founder and chief executive, Calisto Tanzi,[35] and its chief financial officer, Fausto Tonna.[36]  As the company suffered mounting losses from the looting, the insiders sought to hide the financial hemorrhaging with misleading manipulations and false transactions.[37]  According to the FAC, none of these transactions was intended to benefit Parmalat; each instead was designed solely to facilitate the insiders' looting of the company.[38]

The FAC alleges that Parmalat's then-auditors, Lorenzo Penca and Maurizio Bianchi of GT-Italy, were aware of and assisted with the looting cover-up from the beginning.  Penca, Bianchi, and the corrupt insiders first devised a scheme to use offshore companies to offload debt and manufacture the appearance of revenue.[39]  Initially, the scheme involved three shell companies

---

[34]
      *Id.* ¶ 342-43.

[35]
      *Id.* ¶ 342.

[36]
      *Id.* ¶ 358.

[37]
      *Id.* ¶¶ 343, 348.

[38]
      *Id.* ¶ 348.

[39]
      *Id.* ¶¶ 355, 358.

that were used to hide Parmalat's losses and to divert money to the insiders.[40]  Later, in 1998, the

insiders and Parmalat's auditors at Grant Thornton incorporated Bonlat Financing, Ltd. ("Bonlat"),

a Cayman Islands company that became the principal vehicle for the fraud.[41]  Bonlat then served as

a dumping ground for Parmalat liabilities, all the while booking fictitious sales and revenue.[42]

As a result of the fictitious and dummy transactions that Parmalat's corrupt insiders

and GT-Italy auditors executed through Bonlat, its holdings represented forty percent of Parmalat's

assets by the end of 2002.[43]  Indeed, it reported ownership of a Bank of America account containing

$4.9 billion.[44]  Grant Thornton[45] drafted a request to Bank of America to confirm the existence of

the account during its audit of Bonlat's financial statements for 2002, but apparently never sent it.[46]

"Instead, Grant Thornton accepted, directly from Parmalat, a letter purporting to be from Bank of

America dated March 6, 2003" that certified the existence of the bank account.[47]  The bank account,

---

[40]
    *Id.* ¶¶ 355-66.

[41]
    *Id.* ¶ 367-76.

[42]
    *Id.*

[43]
    *Id.* ¶ 375.

[44]
    *Id.* ¶ 377.

[45]
    As in the original complaint, plaintiff uses the generic term "Grant Thornton" to refer to all of the Grant Thornton defendants – GT-Italy, GTI, and GT-USA. The Court uses plaintiff's terminology, although it readily is apparent that plaintiff here is referring to GT-Italy.

[46]
    FAC ¶ 377.

[47]
    *Id.* ¶ 378.

however, did not exist, and the letter turned out to have been forged by a member of Parmalat's finance department.[48]

There were limits to the extent to which Bonlat alone could be used to hide Parmalat's massive losses from the insider looting.[49]  Accordingly, the corrupt Parmalat insiders and the company's lawyer, Gian Paolo Zini, created Epicurum, Ltd., a Cayman Islands investment fund that was "'given' a $100 million receivable from Boston Holding, Inc., another allegedly fake company run by Zini in New York,'" as well as €500 million in promissory notes issued by two Zini-controlled entities connected to Bonlat.[50]  Bonlat's books thus revealed an investment in Epicurum of over $600 million in the form of promissory notes.[51]  Grant Thornton accepted the assurances of Parmalat insiders that the Epicurum investment had been made on an arm's length basis and did not independently investigate the transaction other than to assure itself that the names of Epicurum's directors did not "sound Italian."[52]

Grant Thornton allegedly had every reason to doubt the legitimacy of the investment in the Epicurum fund.  Although Bonlat's supposed investment was in the form of promissory notes, there was nothing to indicate that the notes were collectible or that the interest due on them was

---

[48]

   *Id.* ¶ 379.

[49]

   *Id.* ¶¶ 381-82.

[50]

   *Id.* ¶ 384.

[51]

   *Id.* ¶ 385-86.

[52]

   *Id.* ¶ 387-88.

being paid.[53] Once GT-Italy partners Bianchi and Pena pointed out these deficiencies, Tonna and the GT-Italy auditors decided to transform the promissory notes into an equity investment,[54] in consequence of which Parmalat's financial statements reflected a nonexistent asset of $625 million.[55]

## C. Deloitte Takes Over as Parmalat's Primary Auditor

In 1999, Parmalat hired Deloitte Italy as its principal auditor.[56] Deloitte Italy and other Deloitte member firms audited Parmalat and its various subsidiaries and affiliates around the world, while GT-Italy served as the auditor for Bonlat and some of Parmalat's other offshore entities.[57] The audit reports that Deloitte Italy and other member firms prepared for Parmalat Finanziaria bear the names and logos of DTT and Deloitte & Touche, with an Italian address.[58]

The FAC details several transactions that, plaintiff argues, should have revealed to Deloitte that the insiders were pillaging the company and hiding their theft by means of a massive fraud. One such allegedly questionable transaction began on July 10, 2001, when Parmalat Finance Capital Ltd. ("Parmalat Finance") recorded a receivable from the Western Alps Foundation in the

---

[53]
  *Id.* ¶ 389-91.

[54]
  *Id.* ¶ 392.

[55]
  *Id.* ¶ 393.

[56]
  *Id.* ¶¶ 4, 205.

[57]
  *Id.* ¶ 205-06.

[58]
  *Id.* ¶¶ 202, 204.

amount of $18 million.[59]  That amount increased to $21.9 million by the end of 2001 and then grew

to $28.9 million on March 1, 2002.[60]  "It then was 'reversed' and disappeared from Parmalat Capital

Finance's books on March 15, 2002."[61]

 There never was any documentation for this transaction, which was just as well,

plaintiff contends, since the telephone number and address for the Western Alps Foundation were

the same as those of Zini in New York, and the Western Alps Foundation had been dissolved as of

September 25, 2001.[62]  Dr. Bondi contends that the Deloitte auditors did not investigate this

transaction or others that would have alerted them to the scope of the fraud.[63]  *In toto*, he claims,

Deloitte[64] auditors "'missed' some $5.176 billion in debts that had been 'offloaded' to Bonlat as

'intercompany debt'" and then removed from Parmalat's financial statements.[65]

 In addition to failing to blow the whistle on the alleged fraud, plaintiff contends that

Deloitte auditors actively assisted Parmalat insiders in their efforts to loot the company.  One

---

[59]
 *Id.* ¶ 435.

[60]
 *Id.*

[61]
 *Id.*

[62]
 *Id.* ¶¶ 436-38.

[63]
 Deloitte & Touche Malta took over the audit of Parmalat Capital in April of 2002.  *Id.* ¶ 416.

[64]
 As in the original complaint, plaintiff uses the term "Deloitte" to refer to the defendants DTT, Deloitte USA, and Deloitte Italy.

[65]
 FAC ¶ 410.

example involved the audit of Parmalat's Brazilian subsidiaries in 2001 and 2002.[66]  In 2002, Wanderlay Olivetti, the partner at Deloitte Touche Tohmatsu Auditores Independentes ("Deloitte Brazil") in charge of auditing Parmalat Participações do Brasil ("Parmalat Participações"), Parmalat's Brazilian subsidiary, raised questions with respect to certain intercompany transactions that were not documented properly.[67]  The chief financial officer of Parmalat's Brazilian operations told the Brazilian auditors that "the transaction was designed and instructed by the Parent company to improve the margin of Parmalat [Participações] sales and also not report material losses in Brazil."[68]  On February 4, 2002, Olivetti sent an e-mail to Adolfo Mamoli, the Deloitte Italy partner in charge of the Parmalat audit, about his concerns, stating that Deloitte would have to include "a detailed footnote in the financial statements to disclose the transaction."[69]  He noted also that other transactions would have to be explained in an "emphasis paragraph."[70]

On April 5, 2002, Mamoli sent a note to James Copeland, the chief executive officer of DTT and Deloitte USA.  He stated that Deloitte Brazil was having problems with certain transactions, expressed concern that Parmalat would fire Deloitte as its worldwide auditor, and asked

---

[66]

*Id*. ¶¶ 590-624.  Olivetti previously had raised concerns about intercompany transactions in respect of Parmalat Participações' financial statements for 2001 and certain "receivables" from Bonlat and other Parmalat offshore entities that he did not believe would be paid.  *Id.* ¶¶ 576-85.

[67]

*Id*. ¶¶ 590-92.

[68]

*Id*. ¶ 594.

[69]

*Id*. ¶ 595.

[70]

*Id*. ¶ 596.

Copeland to intervene.[71]  Although the FAC does not indicate whether Copeland did anything in response to this request, Olivetti apparently agreed in May 2002 not to issue a qualified opinion. Instead, he included only an emphasis note, which plaintiff claims did not raise the same red flags as an auditor's exception or qualification.[72]  Deloitte Italy then certified Parmalat's 2001 financial statements without any note of these problems.[73]

Olivetti again raised concerns about the financial statements of Parmalat Participações with Mamoli in 2003, particularly in respect of $554 million in receivables it had from Bonlat.[74] He asked Mamoli to "'perform certain investigations at Bonlat' and to 'verify if your team in Italy has information about Bonlat.'"[75] Subsequently, he "threatened to refuse to sign off on Parmalat Participações' financials, which in turn would have made it difficult for the other Deloitte member firms . . . to sign off on Parmalat's overall consolidated financial statements."[76] In consequence, plaintiff alleges, Deloitte "'removed' Olivetti from any further role in auditing Parmalat's Brazilian operations."[77]

---

[71]     *Id.* ¶¶ 597-98.

[72]     *Id.* ¶¶ 599-600.

[73]     *Id.* ¶¶ 601, 607.

[74]     *Id.* ¶¶ 620-621.

[75]     *Id.* ¶ 622.

[76]     *Id.* ¶ 624.

[77]     *Id.*

The FAC alleges other instances in which Deloitte auditors omitted significant qualifications or exceptions from their opinions on Parmalat's consolidated financial statements or failed to follow up on clear warning signals. Plaintiff contends that the corrupt insiders at the company were able to waste, steal, or squander approximately $10 billion as a result of Deloitte and Grant Thornton's failure to audit Parmalat properly and to disclose the fraud and their participation in and furtherance of it.[78]

### III.    The Standard

As a general rule, a court deciding a Rule 12(b)(6) motion accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[79] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[80]

---

[78]    *Id.* ¶¶ 782-801.

[79]    *E.g.*, *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 237 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[80]    *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

*IV.    Threshold Matters*

*A.    Choice of Law*

As the transferee forum in this diversity action, the Court applies the substantive law that would be applied by the transferor forum, in this instance the Northern District of Illinois.[81] All parties agree that the applicable substantive law is that of Illinois.

*B.    Counts Dismissed Without Leave to Amend*

In *Grant Thornton II*, the Court dismissed Counts 6, 9, and 10 and Bondi's claims on behalf of creditors without leave to amend.[82] Nonetheless, Bondi has included those claims in the FAC,[83] unaltered, contending that the Seventh Circuit may require him to do so to preserve those claims for appeal.[84]

It is not at all clear that the Seventh Circuit so requires.[85] In any case, Bondi has preserved his position. Counts 6, 9, 10, and his claims on behalf of creditors are again dismissed.

---

81

See *Grant Thornton II*, 377 F. Supp. 2d at 402 n.78.

82

See *id.* at 421-22.

83

See FAC ¶¶ 870-72, 886-904, Prayer for Relief.

84

See Martin Decl., Ex. K.

85

See, e.g., *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990) ("It is not waiver – it is prudence and economy – for parties not to reassert a position that the trial judge has rejected."); *Serritella v. Markum*, 119 F.3d 506, 512 n.6 (7th Cir. 1997); *but cf. Johnson v. Myers*, 109 Fed. Appx. 792, 796 (7th Cir. 2004) (unpublished) (question has not been determined; citing with approval other circuits' determination that failure to replead a dismissed claim in an amended complaint did not waive appeal).

## C.    Inconsistency with Original Complaint

Several defendants argue that Bondi is bound by admissions in the original complaint and that he may not file an amended complaint that contradicts those prior factual allegations.  As noted in this Court's recent decision in Bondi's related case against Bank of America,[86] this argument is without merit.  While prior inconsistent pleadings normally are admissible against a party, they ordinarily are "controvertible, not conclusive" admissions.[87]

## D.    Applicability of the In Pari Delicto Defense

All defendants[88] argue that the FAC should be dismissed in its entirety under the doctrine of *in pari delicto*, which prevents "a plaintiff who has participated in the wrongdoing [from] recover[ing] damages resulting from the wrongdoing."[89]  Defendants contend that the FAC admits that Parmalat itself participated in the fraudulent transactions and that Bondi's claims therefore all are barred.

---

[86]
*Bondi v. Bank of Am. Corp.*, ___ F. Supp. 2d ___ (S.D.N.Y. 2006).

[87]
*The Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 395 n.5 (S.D.N.Y. 1988); *see also, e.g., Barris v. Hamilton*, No. 96 Civ. 9541 (DAB) 1999 WL 311813, *2 (S.D.N.Y. May 17, 1999).

[88]
GTI moves to dismiss on this ground and that of inconsistency and reliance only.  *See generally* GTI Mem.

[89]
*King v. First Cap. Fin. Serv. Corp.*, 215 Ill. 1, 33-34, 828 N.E.2d 1155, 1173-74 (Ill. 2005) (internal citations omitted).

1.      *Alleged Waiver*

Bondi argues that defendants have waived this defense by not raising it in their motions to dismiss the original complaint.  An amended complaint, however, supersedes the original and entitles a defendant to raise substantive arguments aimed at "judicial resolution of the controversy" in a new responsive pleading, even if those arguments were not raised in response to the original complaint.[90]

2.      *Applicability of the Defense*

The doctrine of *in pari delicto* prevents a party from suing others for a wrong in which the party itself participated.[91]  A court "will not aid a fraudfeasor who invokes the court's jurisdiction" to relieve it of the consequences of its fraud.[92]

Defendants argue that the FAC alleges not only that Parmalat itself participated in the fraudulent scheme, but also that the corrupt insiders were acting within the scope of their agency,

---

[90]
See, e.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); *Altschuler v. Univ. of Penn. Law Sch.*, No. 95 Civ. 249 (LLS), 1998 WL 113989, *2 (S.D.N.Y. Mar. 13, 1998).  Moreover, FED. R. CIV. P. 12(g) and (h)(2) explicitly provide that the defense of failure to state a claim is not waived in these circumstances.

[91]
See, e.g., King, 215 Ill. at 33-34, 828 N.E.2d at 1173-74.

[92]
Mettes v. Quinn, 89 Ill. App. 3d 77, 80, 411 N.E.2d 549, 551 (3d Dist. 1980) (internal citations omitted).

which would result in the imputation of their knowledge of and participation in the wrongdoing to Parmalat.[93]   Bondi responds that the FAC alleges that the corrupt insiders looted Parmalat with Grant Thornton and Deloitte's help and argues that an agent's knowledge is not imputed to the principal when the agent is "acting adversely to the principal, and for his own benefit."[94]

The FAC does not allege that Parmalat participated in the fraud.  Although the focus generally is on the activities of Deloitte and Grant Thornton, rather than on Parmalat's, the facts alleged do not show that Parmalat itself was involved in the schemes.  Instead, the FAC emphasizes the corrupt insiders and their motivation to loot Parmalat and to benefit only themselves.  For example, the FAC alleges that, with the help of GT-Italy, the insiders set up "fictitious companies and structur[ed] fake transactions whose only purpose was to siphon off billions of dollars of assets from Parmalat and its subsidiaries."[95]   More particularly, the FAC alleges that the insiders "orchestrated massive frauds on Parmalat itself" by "setting up offshore companies in financial secrecy havens whose basic purpose was to engage in transactions designed to hide Parmalat's mounting losses, and to siphon off billions of dollars and euros from the company into their own pockets."[96]  Later, describing the fraudulent transactions generally, the FAC alleges:

---

[93]

> *See, e.g.*, *John Deere Co. v. Metzler*, 51 Ill. App. 2d 340, 355, 201 N.E.2d 478, 486 (4th Dist. 1964) (generally, "the acts of an agent are considered in law to be those of the principal"); *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1209-10 (7th Cir. 1993) (applying Illinois law) (a corporate officer's fraudulent conduct generally is imputed to the corporation).

[94]

> *Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 436 (7th Cir. 1992) (applying Illinois law).

[95]

> *See* FAC ¶ 3.

[96]

> *Id.*, ¶¶ 342-43.

"[T]hese fictions were being used to divert billions of dollars from Parmalat into the hands of the Parmalat insiders for their sole benefit and to hide the billions of dollars that Parmalat was losing in its operations worldwide. None of these transactions or financial manipulations was intended to or did benefit Parmalat. They were designed to and did loot the company, deprive its shareholders of their investment and steal money from the bond- and note-holders who purchased billions of dollars of the company's debt."[97]

As a final example, Bondi alleges that the insiders' actions were "intended to and did benefit only them personally" and that they "totally abandoned the interests of Parmalat. Parmalat in no way benefitted from their actions and was in every sense the victim."[98]

The FAC thus is consistent throughout in avoiding characterization of Parmalat as a participant and in alleging that the corrupt insiders acted "adversely to [Parmalat], and for [their] own benefit."[99] Despite defendants' complaints that these allegations are too sweeping, the tenor of the FAC is that the corrupt insiders, working in some cases with Grant Thornton and Deloitte, looted and harmed Parmalat. The only sense in which Parmalat allegedly participated was as the insiders' puppet. Bondi may well have trouble proving that this was the case, but that must await another day.

Defendants argue further that a principal may be charged with an agent's knowledge, even if the agent is acting adversely to it, if the "adverse agent is also the *sole* representative of the

---

[97] *Id.*, ¶¶ 347-48.

[98] *Id.*, ¶¶ 789-90.

[99] *Ash*, 957 F.2d at 436 (7th Cir. 1992).

principal in the transaction in question."[100]   They posit that the corrupt insiders were the lone

representatives of Parmalat in the transactions described in the FAC.

Even assuming that defendants are correct that the insiders could be considered

Parmalat's sole representatives for these transactions, the cases upon which they rely for this sole

actor exception are distinguishable.  In *Mutual Investment Co. v. Wildman*,[101] for example, the court

was concerned with the fairness of allowing small corporations that act only through one or two

individuals to disclaim knowledge of those agents' activities.[102]   Parmalat was several orders of

magnitude larger.  There arguably was no equivalent risk of its agents being seen by others as

indistinguishable from the company.  Indeed, as all corporations act only through their agents,

extending *Wildman* to large companies would eliminate the adverse agent exception.

Similarly, in *First National Bank of Cicero v. Lewco Securities Corp.*,[103] the appellate

court did not hold that the agent in question was a sole actor, as it sent the case back to the district

court for that determination.[104]   Moreover, the Seventh Circuit later limited *Lewco*, noting that

"[n]one of the 'sole actor' cases [] allows the imputation of knowledge to the principal where the

adverse party knew that the agent was acting adversely to his employer – where, indeed, the adverse

---

[100]

    *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F. 2d 1407, 1417 (7th Cir. 1988) (applying Illinois law) (emphasis in original).

[101]

    182 Ill. App. 137 (1st Dist. 1913).

[102]

    *See id.* at 140.

[103]

    860 F.2d 1407.

[104]

    *See id.* at 1418-19.

party participated in the fraud."[105] The court stated that otherwise, "anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim."[106] Here, the FAC alleges that Deloitte and Grant Thornton knew that the corrupt insiders were stealing from the company and participated, to some extent, in their cover-up.[107] Accordingly, it is impossible to say, solely on the basis of the pleading, that the sole actor exception to the adverse agent rule applies.

Finally, defendants argue that the Court should apply a kind of "disparate involvement" defense, under which even if a plaintiff is not barred by *in pari delicto*, its claim will be dismissed if its connection to the fraud or the fraudulent actor is significantly greater than the defendant's connection. However, not only did defendants' lone case in support of this theory apply Indiana – not Illinois – law, but it dismissed the claims against the broker-dealer defendants because "there [was] no allegation whatsoever that the defendants were directly involved" in the fraudulent transactions.[108] By contrast, the FAC describes Deloitte and Grant Thornton's direct involvement in the corrupt insiders' schemes to loot Parmalat and hide the thefts.[109]

E.      *Lack of Reliance*

---

[105]

    *Ash*, 957 F.2d at 436.

[106]

    *Id.*

[107]

    *E.g.*, FAC ¶¶ 3, 83, 88, 344-347, 366, 376, 508-09, 571-74, 793, 797, 806-810.

[108]

    *Knauer v. Jonathon Roberts Fin. Grp, Inc.*, 348 F. 3d 230, 236-37 (7th Cir. 2003).

[109]

    *E.g.*, FAC ¶¶ 3, 83, 88, 344-347, 366, 376, 508-09, 571-74, 793, 797, 806-810.

In an argument similar to their *in pari delicto* defense, defendants argue that Bondi's claims must fail for lack of reliance because Parmalat participated in and was aware of the fraudulent transactions through the imputed knowledge of its agents. This argument is rejected for the reasons explained above.

Defendants argue further that Bondi's theory of reliance – that innocent insiders at Parmalat relied on defendants' audits and would have acted to stop the fraud had they been notified of the scheme – is not permitted under Illinois law, which does not recognize an "innocent insider" rule. Defendants' sole support for their proposition, *Cenco Inc. v. Seidman & Seidman*,[110] is not on point, as it did not reject such a theory of reliance *per se*. Instead, it held that where a corporation's corrupt managers acted *for the company's benefit*, a jury instruction stating that the managers' fraud could be imputed to the company (and thus bar the claim against the auditor defendant) was proper.[111] In contrast, the FAC alleges that the corrupt insiders were acting against the company's interests, making *Cenco*'s analysis inapposite.

### V. *Sufficiency of the Allegations Against Particular Defendants*

#### A. *Vicarious Liability*

Several issues on these motions arise in consequence of defendants' organizational structures.[112] As before, plaintiff claims that DTT and Deloitte USA were engaged in a joint venture

---

[110]

686 F.2d 449 (7th Cir. 1982).

[111]

*See id.* at 456.

[112]

*See Grant Thornton II*, 377 F. Supp. 2d at 401.

with Deloitte Italy to audit Parmalat and therefore are liable for Deloitte Italy's acts and omissions.[113]

Plaintiff now claims that GTI was both an agent and *alter ego* of GT-USA, making GT-USA liable

for the acts and omissions of GTI's agent, GT-Italy.

    *1.*    *DTT*

        In *Grant Thornton II*, the Court based its holding that the original complaint alleged

adequately an agency relationship between DTT and Deloitte Italy in part on an allegation that "the

global Deloitte organization 'removed' Olivetti from any further role in auditing Parmalat's Brazilian

operations."[114]    The FAC has changed the wording of the corresponding paragraph from "global

Deloitte organization" to "Deloitte" which, as defined, includes DTT, Deloitte USA, Deloitte Italy,

and all other Deloitte member firms that audited Parmalat.[115]    DTT argues that this change in

wording eliminates the alleged agency relationship between DTT and Deloitte Italy and that DTT

therefore cannot be held liable for Deloitte Italy's acts and omissions.

        The argument overreaches. *Grant Thornton II* relied not just on that single allegation,

but also on its analysis in the related class action of the DTT-Deloitte Italy relationship.[116]    Both

---

[113]

        The Court previously held that the allegations in the original complaint supported an inference that Deloitte Italy was an agent of DTT and GT-Italy was an agent of GTI with regard to the Parmalat audit. *See id.* at 404-05, 408.

[114]

        *See id.* at 400.

[115]

        *See* FAC ¶¶ 63, 624.

[116]

        *See* 377 F. Supp. 2d at 404; *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 294-95 (S.D.N.Y. 2005).

opinions stressed that the firms' disclaimers of agency were insufficient in light of the complaints' contrasting descriptions of the relationship between DTT and Deloitte Italy. Further, *Grant Thornton II* referred not just to DTT's alleged removal of Olivetti, but also to its "alleged intervention to direct Olivetti in his conduct of the Parmalat audit."[117] The FAC still describes that intervention.[118] Accordingly, the FAC, like the original complaint, alleges adequately an agency relationship between DTT and Deloitte Italy.

2.      *Deloitte USA*

*Grant Thornton II* held that the original complaint did not state a claim against Deloitte USA on any theory of vicarious liability – agency, joint venture, or *alter ego*.[119] The FAC abandons the agency and *alter ego* theories[120] but again asserts that Deloitte USA is vicariously liable as a member of a joint venture to audit Parmalat.

As explained in *Grant Thornton II*, a joint venture "is an association of two or more persons to carry on a single enterprise for profit . . . the touchstone of [the] form is that each party contributes property and they have a community of interests in the profits of the enterprise."[121] Further, the "existence of a joint venture may be inferred from allegations showing that an enterprise

---

[117]

377 F. Supp. 2d at 405.

[118]

*See, e.g.*, FAC ¶¶ 586, 597-98.

[119]

*See* 377 F. Supp. 2d at 405-08.

[120]

*See generally* Pl. Mem.

[121]

*See Grant Thornton II,* 377 F. Supp. 2d at 402-03 (internal citations omitted).

was entered into and the intent of the parties to do so, with intent being the most important element."[122]  Several factors are suggestive of such intent:

> "(1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses."[123]

The mutual right to exercise control over the enterprise refers to "the right to direct and govern the conduct of each other in connection with the joint venture."[124]

In the original complaint, Bondi alleged that the Deloitte defendants audited Parmalat as a joint venture.  In its prior motion to dismiss, Deloitte USA argued that the theory failed because the complaint did not allege either a mutual right to exercise control over the enterprise or a duty to share profits and losses.  *Grant Thornton II* held that the complaint adequately alleged that the Deloitte firms' compensation mechanism could be construed as a duty to share profits or losses.[125]

Bondi, however, did not allege adequately that the member firms had the requisite right to exercise mutual control over the enterprise, meaning one another's work or management on the Parmalat audit.[126]  Allegations that DTT removed Olivetti, the partner at Deloitte Brazil, over

---

[122]   *Id*. at 403 (internal citations omitted).

[123]   *Id*.

[124]   *Id*. at 407.

[125]   *See id*. at 406.

[126]   *See id*. at 407.

conflicts with the Parmalat audit cut against the existence of a joint venture by suggesting that "such control [over the work and management of sister firms] was the province of DTT." *Id.*  Further, the allegations that several firms worked on specific Parmalat-related assets together and that they all followed the same auditing standards did not "give rise to an inference that any one firm could direct the polices or procedures of another firm, or that if they could, each firm had an equal right to direct the policies of another firm."[127]  Accordingly, the original complaint did not allege adequately that the alleged joint venturers possessed a mutual right to exercise control over the enterprise.

The FAC suffers from the same problems.  Bondi argues that DTT and its member firms, including Deloitte USA, are a unified, integrated firm.[128]  But this oft-repeated mantra does not address the key issue of mutual right to exercise control over sister firms relating to the Parmalat audit.  Bondi again emphasizes the unified dispute resolution and auditing standards,[129] but remains unable to inflate those allegations into an inference that "each firm had an equal right to direct the policies of another firm" with regard to the Parmalat audit.[130]

Finally, Bondi argues that to allege a mutual right to exercise control over the enterprise, he need show *only any* division of labor between venturers.  But this misconstrues Illinois law.  A mutual right to exercise control over the enterprise does not exist

"wherever parties divide responsibilities along functional lines.  Rather, [] the fact

---

[127]

    *Id*.

[128]

    *See* Pl. Mem. at 8.

[129]

    *See id*. at 14, 16-18.

[130]

    *See Grant Thornton II*, 377 F. Supp. 2d at 407.

that one party was not involved in every aspect of an enterprise does not preclude the finding of a joint-venture . . . mutual control [does not exist given] the inability of either party to exercise control over the other toward achieving the object of the alleged joint-venture."[131]

The FAC's statement that the alleged joint venturers worked on different areas of the Parmalat audit therefore is insufficient to support an inference that therefore they possessed a mutual ability to exercise control over one another with regards to the enterprise.

Finally, Deloitte USA argues that the Deloitte entities' choice of a limited liability structure indicates a lack of the necessary intent to be associated as joint venturers. While Bondi is correct that the verein structure in and of itself is not determinative and can be contradicted by the entities' behavior,[132] Deloitte USA's point is somewhat different – that the very choice of the verein structure indicates a lack of intent to be associated as joint venturers. Without such intent, the joint venture theory fails.

In any event, the lack of allegations regarding a mutual right to exercise control over the sister firms' conduct of the Parmalat audit is fatal to Bondi's joint venture theory. As he has abandoned his agency and *alter ego* arguments, there is no basis for his claims against Deloitte USA based on Deloitte Italy's conduct.

3.      *GT-USA*

As the original complaint failed to allege that GT-USA knew about or was involved

---

[131]

*Trustmark Ins. Co. v. Gen. Cologne Life Reins. of Am.*, 424 F.3d 542, 548 (7th Cir. 2005) (applying Illinois law).

[132]

*See Grant Thornton II*, 377 F. Supp. 2d at 405.

in any wrongdoing or had any ability to control any other potential wrongdoer, all claims against that defendant were dismissed.[133]  The FAC does not purport to bring direct claims against GT-USA.[134]  It alleges, however, that GT-USA is liable for GT-Italy's actions and omissions on agency and *alter ego* theories.[135]

As explained in *Grant Thornton II*, a principal-agent relationship exists when the principal has the right to control the manner and method in which the agent performs its work and the agent has the power to act on the principal's behalf.[136]  "An agent's authority may be either actual or apparent, and actual authority may be either express or implied."[137]  The existence of an agency relationship may be established by direct or "circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances."[138]  The alleged agent's authority, however, may be established only on the basis of words or conduct of the alleged principal.[139]  Bondi contends that the FAC shows that GT-USA "dominated GTI and GTI was the agency by which [GT-

---

[133]

See id. at 408-09.

[134]

See generally Pl. Mem.

[135]

Although the FAC asserts cursorily that GT-USA and GT-Italy participated in a joint venture to audit Parmalat, see ¶ 177, and GT-USA argued against that theory in its Memorandum, Bondi does not address it in his Opposition, instead discussing agency and *alter ego* theories only.  *See generally* Pl. Mem.

[136]

See Grant Thornton II, 377 F. Supp. at 402.

[137]

Id.

[138]

Id.

[139]

Id.

USA] controlled the overall Grant Thornton organization worldwide."[140]  As the original complaint alleged adequately that GT-Italy was GTI's agent,[141] Bondi argues that GT-Italy therefore was the sub-agent of GT-USA through GTI.

GT-USA is the largest member firm of GTI.[142]  The FAC alleges that its "size, personnel and enormous financial resources dominate GTI."[143]  It allegedly dominates GTI's International Management Board,[144] and co-owns the worldwide rights to the Grant Thornton names and regulates their use.[145] It controls whether proposed member firms will be admitted to GTI, whether the GTI member firm agreement may be amended, whether the number of members on the GTI board will be changed, and whether GTI will be dissolved.[146]

The alleged dominance and control of GT-USA over GTI is "circumstantial evidence [of] the situation of the parties, their acts, and other relevant circumstances" from which the agency relationship can be inferred.[147]  As a complaint may not be dismissed unless the plaintiff could prove

---

[140]
    Pl. Mem. at 18.

[141]
    *See Grant Thornton II,* 377 F. Supp. 2d at 408.

[142]
    *See* FAC ¶ 138.

[143]
    *See id.* ¶ 139.

[144]
    *See id.* ¶¶ 140-143.

[145]
    *See id.* ¶¶ 145-150.

[146]
    *See id.* ¶¶ 151-155.

[147]
    *Grant Thornton II,* 377 F. Supp. 2d at 402.

no facts under its allegations that would entitle it to relief,[148] the Court holds that the FAC alleges adequately that GTI was the agent of GT-USA. There is, in consequence, no need to consider the *alter ego* theory.

## B.    *Direct Claims*

Deloitte Italy and Deloitte USA seek dismissal of the direct claims asserted against them in the FAC.

### 1.    *Deloitte Italy*

#### a.    *Conspiracy*

Deloitte Italy argues that the conspiracy claim against it must fail because the FAC's conclusory assertions that Deloitte Italy knew about the fraud and agreed to participate in the conspiracy are insufficient to state a claim. Bondi responds that the prior opinion already determined that the conspiracy count against Deloitte Italy was sufficient and, in any event, that the FAC contains sufficient detail.

In rejecting DTT's argument that the original complaint failed to state that it knew of and assisted in the conspiracy, the Court stated, "plaintiff has pleaded the existence of an agency relationship [between DTT and Deloitte Italy] adequately. His allegations against Deloitte Italy [] therefore would be sufficient to establish the necessary elements of a civil conspiracy claim."[149] The

---

[148]    *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

[149]    *Grant Thornton II*, 377 F. Supp. 2d at 417.

second sentence thus refers to the sufficiency of a civil conspiracy claim against both Deloitte Italy and DTT. As the FAC has not materially changed the allegations relating to Deloitte Italy's involvement, there is no reason to revisit the prior ruling.

### b. Unjust Enrichment

Deloitte Italy argues that the unjust enrichment claim against it must fail because "where there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application."[150] Bondi argues that *Grant Thornton II* decided this question as well and, in any event, that the claim falls outside the contract because it seeks to recover for Deloitte Italy's breach of duty.

In analyzing DTT's argument that the original complaint did not state an unjust enrichment claim because it did not plead an independent tort against DTT, the Court stated, "assuming without deciding that an independent tort is necessary, [Bondi] has alleged successfully an independent tort against DTT [] and therefore states a claim for unjust enrichment."[151] The "independent tort" referred to DTT's vicarious liability (via agency) for Deloitte Italy's actions, and so the prior opinion endorsed also the viability of the unjust enrichment claim against Deloitte Italy.

### c. Losses Before 2000

Finally, Deloitte Italy argues that since the FAC does not allege that it committed any

---

[150] Deloitte Italy Mem. at 34.

[151] *Grant Thornton II*, 377 F. Supp. 2d at 417.

wrongful or harmful act until May 2000, counts against it that seek damages "for the first decade of the fraud" are impermissible. It seeks dismissal except to the extent that the claims seek damages incurred in 2000-2003. Bondi does not address the argument in his Opposition and Deloitte Italy does not revisit it in its Reply.

Deloitte Italy does not cite precedent dismissing claims for this reason. Should the case reach the issue of damages, Bondi will have to prove his losses. If Deloitte Italy did not arrive on the scene until 2000, then it can argue the point at that time.

2.      *Deloitte USA*

*Grant Thornton II* dismissed all of Bondi's direct claims against Deloitte USA, as the original complaint failed to identify anything that Deloitte USA did wrong in its audits of Parmalat USA, to link Deloitte USA's actions to Parmalat's losses, or to allege facts implying that Deloitte USA "knowingly participated" in any fraud.[152]

The FAC again brings direct claims against Deloitte USA for malpractice, negligent misrepresentation, fraud, and other intentional torts. Deloitte USA moves to dismiss for a host of reasons, of which it is necessary to address only one.[153]

Deloitte USA begins by arguing that all the direct claims against it fail for lack of

---

[152]      *See id.* at 410-12.

[153]      Although it is unnecessary to reach Deloitte USA's further arguments for dismissal, the Court notes that the FAC does not appear to have solved the original complaint's failure to allege facts giving rise to a strong inference that Deloitte USA knowingly engaged in wrongdoing. *See id.* at 411-12.

causation, as the chain linking Deloitte USA to Parmalat's $10 billion in damages is too attenuated.

Deloitte USA describes the FAC's causation theory as:

> "It goes like this: had Deloitte USA conducted a better audit of Parmalat USA, Parmalat USA's financial statements would have reflected a negative EBITDA; the negative EBITDA would have violated Parmalat USA's debt covenants and might have triggered default notices; the default notices on North American loans would have impacted other loans taken out by Parmalat S.p.A.; and ultimately, the entire Parmalat group might have collapsed earlier because it would have been forced to refinance all its outstanding debt."[154]

Bondi concedes that this description of his theory is accurate, but argues that it "satisfies the requirements of proximate cause."[155]

In Illinois, as elsewhere, proximate cause generally is a question of fact, but it may be determined as a matter of law "where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause."[156] Cause in fact exists when the alleged facts show that "there is a reasonable certainty that a defendant's acts caused the injury or damage . . . [in other words,] defendant's conduct was a material element and a substantial factor in bringing about the injury."[157] Legal cause, in turn, "involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct."[158]

---

[154] Deloitte USA Mem. at 6.

[155] Pl. Mem. at 28.

[156] *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395-96, 821 N.E. 2d 1099, 1127-28 (Ill. 2004) (internal citations omitted); *see also, e.g., Young v. Bryco Arms*, 213 Ill.2d 433, 821 N.E.2d 1078 (Ill. 2004).

[157] *City of Chicago,* 213 Ill. 2d at 395, 821 N.E.2d at 1127 (internal citations omitted).

[158] *Id.* (internal citations omitted)

While acknowledging the dual nature of proximate cause, Bondi focuses on legal causation by arguing that it was foreseeable that a negligent audit would injure the financial health of a corporation when it relies on the poor work, presumably by making decisions in reliance on the audit's analysis.[159]  But, as Bondi concedes, Deloitte USA's client was Parmalat USA, not Parmalat itself.[160]  The analysis thus includes an extra step – whether it is foreseeable that a negligent audit of a subsidiary would injure the financial health of the entire group.

Moreover, the final step in the chain is not that Parmalat relied on the improperly-prepared audits of Parmalat USA.  Rather, the causation theory is that because Deloitte USA did not correctly audit Parmalat USA's financial statements, the subsidiary was not subjected to further scrutiny and, in turn, broader attention was not brought to bear upon the (different) fraudulent schemes taking place at Parmalat itself – schemes of which the FAC does not allege Deloitte USA was aware.  In terms of foreseeability, this is quite another matter from a parent changing its position based on the incorrect financial statements of its subsidiary.  Conduct that merely creates "a condition that made the resulting injury possible" is too remote to constitute legal cause.[161]  And in this case, rather than creating a condition that made Parmalat's injury at the hands of its corrupt insiders possible, at best Deloitte USA's conduct concealed an unrelated condition.  This is too

---

[159]

*See* Pl. Mem. at 27.

[160]

*See id.* at 25.

[161]

*City of Chicago*, 213 Ill.2d at 395, 821 N.E.2d at 1127; *see also Young*, 213 Ill.2d at 446, 821 N.E.2d at 1086; *County of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 63-64, 817 N.E.2d 1039,1046 (1st Dist. 2004).

remote a theory to support legal causation.[162]


## VI. *Conclusion*

The motion of Deloitte USA to dismiss the FAC[163] is granted. The motions of DTT,[164] Deloitte Italy,[165] GTI,[166] and GT-USA[167] to dismiss the FAC are granted to the extent that Counts Six, Nine, Ten, and so much of the FAC as seeks recovery on behalf of creditors other than

---

[162]

Further, it is by no means clear that the FAC alleges facts showing that Deloitte USA's actions were "a material element and a substantial factor in bringing about the injury" to Parmalat. *See City of Chicago*, 213 Ill.2d at 395, 821 N.E.2d at 1127. Even under the mandatory assumption that the FAC's allegations about Deloitte USA's conduct are true, it is difficult to see how the improper audits of Parmalat USA were a material element and substantial factor in the corrupt insiders' theft of $10 billion from Parmalat.

[163]

04 Civ. 9771 (LAK) Docket No. 126; 04 Md. 1653 (LAK) Docket No. 223.

[164]

04 Civ. 9771 (LAK) Docket No. 129; 04 Md. 1653 (LAK) Docket No. 226.

[165]

04 Civ. 9771 (LAK) Docket No. 131; 04 Md. 1653 (LAK) Docket No. 228.

[166]

04 Civ. 9771 (LAK) Docket No. 123; 04 Md. 1653 (LAK) Docket No. 219.

[167]

04 Civ. 9771 (LAK) Docket No. 128; 04 Md. 1653 (LAK) Docket No. 225.

the entities in extraordinary administration are dismissed.  The motions are denied in all other respects.

SO ORDERED.

Dated: March 16, 2006

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)